UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TINA OTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV2036 CDP |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Tina Ott's application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et*

*seq*. and supplemental security income under Title XVI of the Act, 42 U.S.C. §§

1381, *et seq*. Claimant Ott brings this action asserting that she is disabled by

congestive heart failure, blood clotting in the heart, high blood pressure, thick

blood, diabetes, hypothyroid or reduced thyroid function, kidney stones, and

granulom or spots on her lungs. The Administrative Law Judge concluded that Ott

was not disabled. Because I find that the decision denying benefits was supported

by substantial evidence, I will affirm the decision.

## Procedural History

On July 17, 2006, claimant Tina Ott field for Period of Disability, Disability Insurance Benefits, and Supplemental Social Security Income.  The Social Security Administration denied the claims, and a timely hearing request was filed.  Ott then appeared and testified at a hearing held on March 14, 2008.  The Administrative Law Judge issued an opinion, on March 28, 2008, upholding the denial of benefits.  On August 27, 2010, the Appeals Council for the Social Security Administration denied Ott's request for review.  The ALJ's determination thus stands as the final determination of the Commissioner.

## Claimant's Testimony Before the ALJ

Ott testified that she was 46 years of age, 5'3" tall, and 265 pounds at the time of the hearing.  She had gained 65 pounds since she stopped working because of inactivity.  She had a high school diploma.  She was married to a man who worked in concrete.  She had a 14 year old son and an older son, who was leaving that April to join the National Guard, living in her home.

Ott alleged disability since February 27, 2006.  Specifically, she alleged disability as a result of congestive heart failure, blood clotting in the heart, high blood pressure, thick blood, diabetes, hyporthyroid or a reduction in thyroid function, kidney stones, and granuloma or spots on her lungs.  The testimony relevant to her alleged physical disability included Ott stating that her primary

physician was Dr. Thomas Davis. She had throbophilia[1] which made it easy for her blood to clot. In December 2005, she was hospitalized in St. John's Hospital in Washington, Missouri. She had some fluid retention which made her sick and tired. She saw a cardiologist, John Mohart, M.D., who told her she had a blood clot in her heart and helped her "get rid of it." Her symptoms, at that time, included fatigue, swelling, and shortness of breath. She was also hospitalized in January 2008 because of congestive heart failure. The congestive heart failure caused her "swelling" and made it hard for her to do anything because she got shortness of breath. Ott was sure that her heart had suffered damage. Ott had taken blood thinners in the past, but had been taken off blood thinners by the time of the hearing. She testified that she had been taken off Medicaid and had only recently started receiving Medicaid again. She was taking blood pressure medication at the time of the hearing and took aspirin all the time. When asked the status of her clotting, at the hearing, Ott testified that "[s]upposedly it's gone," but her symptoms of fatigue, swelling, and shortness of breath had not changed and she could not do "very much at a time without getting really short-winded and really tired."

---

[1]Thrombophilia is defined as "[a] disorder of the hemopoietic system in which there is a tendency to the occurrence of thrombosis." *Stedman's Medical Dictionary* (27th ed. 2000). Hemopoietic is defined as "[p]ertaining to or related to the formation of blood cells." *Id.* Thrombosis is defined as "[f]ormation or presence of a thrombus; clotting within a blood vessel which may cause infarction of tissues supplied by the vessel." *Id.*

Ott testified that she found out she also had sleep apnea[2] during her January 2008 hospitalization. The sleep apnea caused Ott to be "tired all the time" and she got poor sleep because she would wake up and have trouble breathing. In January she had an attack where she could not breathe and her blood pressure became elevated. She was prescribed a continuous positive airway pressure machine, i.e., CPAP machine, which she used as instructed. She took metformin for her diabetes, which caused dry mouth. She testified that her diabetes was under control and was not affecting her ability to work. Her frequent kidney stones required medical intervention three times. She had to have surgery twice, once where the stones had to be sonically broken down and once, in January 2005, where the stones had to be taken out through her back.

Ott testified that sometime before 1997 she worked at Treadco as a line inspector doing "really heavy work." She would take sheets of titanium, drag them through acid vats, then inspect them for defects. She was required to lift between 50 and 60 pounds, stoop, bend, stand, and walk. She stopped working there because of the nature of the work and because she was getting a divorce.

From 1997 to 2003, Ott worked at Electric Corp., which made metal cores for electrical components, as a peeler. She testified that she ran a lathe machine

---

[2]Sleep apnea syndrome is defined as "a disorder characterized by multiple episodes of partial or complete cessation of respiration during sleep." *Stedman's Medical Dictionary* (27th ed. 2000).

and a lapping wheel.  She was required to pick up heavy cords, approximately 50 to 60 pounds, put them on the grinding wheels, and hold them there until they grinded down to a smooth finish.  The position required a lot of standing and walking.  She was laid off permanently from that job when the company downsized.

From July 2004 to January 2005, Ott worked at Carson's Furniture Store as a sales representative.  She testified that she sold furniture, made her own displays, and cleaned her area.  Setting up displays required Ott to bend and stoop while moving the furniture.  She was unable to estimate the amount of weight she was required to lift.  Cleaning her area required her to vacuum and dust.  She would stand or walk around for six hours of her eight hour shift.  She was terminated from that job because she had too many absences and was unable to perform her duties.  The absences and inability to perform were attributed to her kidney stones.  It was when she had surgery to remove her kidney stones that she was terminated.

From July of 2005 to February of 2006, Ott worked at Casey's Convenience Store as an assistant manager and cashier.  She testified that she unloaded trucks, stocked shelves, waited on customers, and cleaned the store.  She would stand and walk around for the full eight hour shift and lifted 30 to 40 pounds of inventory at a time.  The position also required her to stoop and bend.  She testified that she had returned to work after her 2005 hospitalization for approximately two weeks

before her doctor told her she could no longer work there because of her congestive heart failure.

Ott also testified that she had worked as a meat cutter for two weeks at some unspecified time.

At the time of the hearing, Ott spent her day folding laundry that her husband or son would bring to her, doing the dishes using a dishwasher, vacuuming small areas for two to three minutes, cooking meals, picking up things on the floor a little bit, watching television, building puzzles, occasionally reading, and speaking to her mother on the telephone. She had to do a little bit at a time, then sit down, then get back up and do more. Ott and her husband did the grocery shopping together twice each week for 30 to 45 minutes at a time. She picked out the food and her husband carried it all. Walking through the store, checking out, and picking up items caused Ott to grow tired and short of breath. Ott could only walk about the distance of a block before she became short of breath, which would be significantly affected if there was an incline or stairs. During trips to the store she would need to rest several times. Ott testified that she could not carry heavy grocery bags, but she could carry a gallon of milk. She could carry 20 pounds, "but not very far." Her husband handled the loading and unloading of the groceries.

Ott testified that she did all of the driving because her husband did not have a license. She drove to the grocery store and to pick her son up from baseball practice every once in awhile. Sitting for extended periods of time while driving caused Ott to grow tired and caused back pain. Ott occasionally visited her mother and two brothers at her mother's home. She did not go out to eat or to movies very often. She could stand in a stationary position for 15 to 20 minutes at a time before she would become short of breath. She could stoop and bend at her knees, but if she had to do it a lot it would cause her to become short of breath. Ott typically went to sleep at 9:30 p.m. She went to bed early because she was tired and because it took her so long to fall asleep.

<u>Medical Evidence</u>

On November 7, 2004, Ott visited the emergency room at St. John's Mercy Hospital. Her chief complaints were kidney pain and vomiting. She also complained of diarrhea, nausea, and dysuria.[3] Keith Ratcliff, M.D., found that Ott's inspiration was "somewhat less than optimal" and patchy areas of infiltrate that had not appeared on prior exams. He also noted that Ott smoked a pack of cigarettes per day. He believed those observations may have been indicative of

_____

[3]Dysuria is defined as "[d]ifficulty or pain in urination." *Stedman's Medical Dictionary* (27th ed. 2000).

some atelectasis.[4]  He also found prominent densities in the right upper quadrant and the pelvis which suggested calcifications, one of which had maximum dimensions of approximately 19 x 12 mm.  Ott received intravenous medications including Phenergan and morphine.  At discharge, Dr. Ratcliff prescribed medications including Levofloxacin and directed Ott to stay home from work until her fever broke and she was felling better.  She was also directed to follow up with her primary care physician.

On November 30, 2004, Ott again visited St. John's Mercy Hospital.  Her chief complaint was right flank pain.  The emergency room physician diagnosed a right kidney stone.  Sunil Apte, M.D. then gave Ott a right ureteral stent.  At discharge, the physician prescribed medication including Levaquin and Amoxicillin.  Ott was directed to follow up with Dr. Apte in two weeks.

On December 7, 2004, a chest imaging test revealed a potential nodule in the right lower lobe.  The radiologist recommended further evaluation with a CT scan.  On December 10, 2004, abdominal imaging studies revealed multiple calcifications in Ott's right kidney.

---

[4]Atelectasis is defined as "[d]ecreased or absent air in the entire or part of a lung, with resulting loss of lung volume. Loss of lung volume itself. *Stedman's Medical Dictionary* (27th ed. 2000).

On January 7, 2005, Ott visited the office of Thomas Davis, M.D., following a chest CT. The nurse noted that the CT revealed old granulomatous disease. Ott was told that her chronic bronchitis[5] could have been caused by tobacco abuse. Ott also complained of anxiety.

From January 27, 2005 to February 1, 2005, Ott was hospitalized at St. John's Mercy Medical Center. Her chief complaint was right flank pain. Dr. Apte noted that further evaluation revealed a 20mm x 10mm stone causing obstruction in Ott's right renal pelvis. Dr. Apte also noted concurrent fever or chills, nausea, vomiting, irritable bowel syndrome, difficulty swallowing, joint pain and stiffness, sinus problems, and that Ott smoked several cigarettes a day. He observed poorly controlled hypertension. Ott's existing stent was removed and a new stent was placed on the right side. Ott underwent surgery to remove the kidney stone. Post-operatively, Ott suffered low blood pressure initially and high blood pressure subsequently, and testing revealed a residual kidney stone on the right. The physician left Ott's nephrostomy tube in to allow removal of the residual stone after discharge from the hospital. At discharge, Ott received instructions that she should not lift or strain for one month and she should not operate a motor vehicle for two weeks. Ott's medications included Benicar, Synthroid, and Dulcolax.

---

[5]Bronchitis is defined as "[i]nflammation of the mucous membrane of the bronchial tubes." *Stedman's Medical Dictionary* (27th ed. 2000).

On February 2, 2005, Ott saw Dr. Davis. She requested instruction regarding her dressings and urine bag. Ott said she had slept well. The nurse also noted a prescription for Norvasc due to high blood pressure and tenderness in the right flank area. The office arranged a follow-up visit with Dr. Apte the next day, and instructed Ott to take her prescriptions for Benicar and Norvasc.

On February 8, 2005, Ott saw Dr. Davis. She complained of discomfort and pain associated with her urostomy tube and some insomnia. Dr. Davis prescribed Temazepam for the insomnia. Dr. Davis also noted back pain. On February 9, 2005, Dr. Davis prescribed Darvocet.

On February 15, 2005, Ott visited St. John's Mercy Hospital. Her chief complaint was a right renal stone. Dr. Apte removed the kidney stone.

On May 2, 2005, Ott had an outpatient radiology exam performed by Royce Lovern. Dr. Lovern found that Ott's prior renal calcifications were largely absent, but he found questionable calcifications in the right upper abdomen.

On November 30, 2005, Ott saw Dr. Mohart for an echocardiography.[6] He found Ott's left ventricle was enlarged to 6.7 cm, a moderate left ventricle dysfunction, an ejection function of 40%, and mild mitral and tricuspid regurgitation or backward flow of blood.

---

[6]Ecocardiography is defined as the "use of ultrasound in the investigation of the heart and great vessels and diagnosis of cardiovascular lesions." *Stedman's Medical Dictionary* (27th ed. 2000).

From December 20, 2005 to December 24, 2005, Ott was admitted to St. John's Mercy Hospital. Ott reported feeling "quite bad," achy, and fatigued. Dr. Mohart described Ott as a patient who had been noncompliant with her medications, and she confessed to complete noncompliance with her medications for many months claiming "they did not make [her] feel any better." He noted improvement in Ott's blood pressure control and a right atrial clot. He diagnosed Ott with hypertension, extreme hypothyroidism,[7] type two diabetes, and sleep apnea. Records further noted significant lower extremity edema,[8] dyspnea,[9] and dyspnea on exertion. Ott was given aggressive diabetic and smoking cessation education. Dr. Mohart also noted much discussion concerning the influence and compliance with her medicines. Dr. Mohart restarted Ott's thyroid medicine. He performed a study on Ott's right atrial clot, which he concluded was approximately 1.5 cm x 1 cm, mobile, and consistent with a thrombus.[10] Ott's

---

[7]Hypothyroidism is defined as "[d]iminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to weight gain, somnolence and sometimes myxedema." *Stedman's Medical Dictionary* (27th ed. 2000).

[8]Edema is defined as "accumulation of an excessive amount of watery fluid in cells or intercellular tissues." *Stedman's Medical Dictionary* (27th ed. 2000).

[9] Dyspena is defined as "[s]hortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." *Stedman's Medical Dictionary* (27th ed. 2000).

[10]Thrombus is defined as "a clot in the cardiovascular systems formed during life from constituents of blood; it may be occlusive or attached to the vessel or heart wall without obstructing the lumen (mural thrombus). *Stedman's Medical Dictionary* (27th ed. 2000).

discharge medications included Coumadin, Synthroid, Glucophage, and Lasix. Ott was also instructed to follow up with Dr. Mohart.

On December 27, 2005, Ott saw Dr. Davis. Her chief complaints were hypothyroidism, atrial clot, hypertension, and diabetes. He noted that Ott was doing quite well, but referred her to a hematologist for some follow up. Dr. Davis's letter to the hematologist, Nelida Sjak-Shie, Ph.D., M.D., stated that Ott had edema and profound fatigue and that Ott had stopped taking her thyroid medicine because it did not make her feel any better. Dr. Davis also described Ott's atrial clot which he said extended down to her inferior vena cava. He stated that even though Ott was taking a "fairly good dose of Coumadin, her INR was only moving minimally."

On December 28, 2005, Ott saw Dr. Sjak-Shie regarding her right atrial clot. Dr. Sjak-Shie agreed with anticoagulation treatment with Lovenox and Coumadin, and ordered further testing. She noted that Ott had smoked from one half to one full pack of cigarettes per day for the preceding 25 years, but had quit smoking the week before. Ott reported no chest pains, dyspnea, i.e., shortness of breath, or wheezing. Ott weighed 249.6 pounds, which Dr. Sjak-Shie noted as moderately obese with no acute distress. Dr. Sjak-Shie noted mild anemia[11] during her

---

[11] Anemia is defined as "[a]ny condition in which the number of red blood cells per mm$^3$, the amount of hemoglobin in 100 ml of blood, and/or the volume of packed red blood cells per 100 ml of blood are less than normal." *Stedman's Medical Dictionary* (27th ed. 2000).

hospital stay which had since improve and was likely due to her heavy periods. Ott was encouraged to take iron supplements with vitamin C to increase absorption.

On December 30, 2005, Ott saw Kim Colter, M.D., at Dr. Davis's office. She was following up because of her recent atrial clot and left calf pain. Dr. Colter noted tenderness in Ott's calf. An ultrasound showed Ott did not have a clot at that time. Dr. Colter diagnosed a likely muscle tear and prescribed warm, moist heat.

On January 13, 2006, Ott saw Dr. Davis. She visited to follow up on her "chronic diseases." Dr. Davis noted that Ott had no shortness of breath, swelling, nausea, or vomiting. He noted that Ott had "indeed, quit smoking." He also noted that her atrial clotting was "well compensated." He found that her hypothyroidism and weight contributed to her diabetes and her atrial clot was "quite resistant to Coumadin." Examination revealed a hematoma in the abdomen at the Lovenox injection site. Dr. Davis gave Ott positive reenforcements concerning her lifestyle changes and directed her to continue to follow up with Dr. Sjak-Shie and Dr. Mohart. Also on January 13, 2006, Ott followed up with Dr. Sjak-Shie. Dr. Sjak-Shie noted compliance with medication, discontinued Lovenox and adjusted other dosages.

In January 2006, Ott saw Dr. Mohart for another echocardiogram. He found normal left and right ventricular size and function, mild mitral regurgitation, a small density most consistent with thrombus which appeared smaller than on previous exams, and an ejection fraction of 70%. Dr. Mohart also noted some shortness of breath and an upper respiratory infection. He continued Coumadin and recommended an additional echocardiogram.

On January 30, 2006, Ott followed up with Dr. Davis regarding counseling and coordination of care. Dr. Davis noted that Ott had resumed smoking, and he had given her extensive counseling concerning the dangers smoking presented. Ott was released to full duty as of the Tuesday following that appointment and directed to follow up.

On February 10, 2006, Ott saw Dr. Sjak-Shie for a routine follow up. Dr. Sjak-Shie noted that Ott had an echocardiogram performed showing a decrease in size of her right atrium clot, Ott had been compliant with medications, and Ott continued to work full-time since she was "allowed to work again." Dr. Sjak-Shie found that Ott was not suffering any chest pain, acute dyspnea, i.e., shortness of breath, or wheezing.

On February 22, 2006, Ott saw Dr. Mohart for another echocardiogram. He found moderate left ventricular dilation, reduced global left ventricular function,

ejection function of 41%, an enlarged left atrium, and mild mitral and tricuspid regurgitation or backward flow of blood.

On March 9, 2006, Ott followed up with Dr. Davis. Her chief complaint was "chronic diseases." Dr. Davis noted Ott had not been keeping serious track of her blood sugar, but she was not smoking and her chronic diseases were "stable, doing very well." Specifically, her atrial clotting was being co-managed by a hematologist and "doing quite well," her hypothyroidism and diabetes were seemingly better, and her high cholesterol was "stable on medications." He also noted that Ott felt well, had no shortness of breath, had no nausea, and had no vomiting. Examination revealed trace pedal edema. Dr. Davis continued the current treatment plan. Records noted follow-up lab tests on June 7, 2006 and June 27, 2006.

From May 2006 to December 2006, Ott followed up with Dr. Sjak-Shie on six occasions, including May 24, June 19, July 10, July 26, October 13, and December 20. During the first three visits Dr. Sjak-Shie noted some noncompliance with medications. On May 24, Ott said she was "difficult to remember" taking her Coumadin and that she had been out of town and had forgotten to take her pills with her. On July 10, Ott reported running out of Lovenox stating that she did not realize she was to continue that medication until advised to discontinue. Dr. Sjak-Shie did note Ott had been complying with her

medication on some of those visits, June 19, July 26, and October 13.  During the first visit and the last three visits Dr. Sjak-Shie found that Ott was not suffering any chest pain, acute dyspnea, i.e., shortness of breath, or wheezing.  During the last two visits Dr. Sjak-Shie noted that Ott was obese, but did not indicate that any instruction or counseling about the risks of her obesity on those dates.  On October 13, Dr. Sjak-Shie noted that Ott had gained another 10 pounds.  During some of these visits Dr. Sjak-Shie referenced Medicaid coverage, employment, and disability.  On July 10, Dr. Sjak-Shie noted that Ott was losing her Medicaid coverage at the end of the month, but was trying to get on disability.  On July 26, Dr. Sjak-Shie noted that Ott had lost her employment.  During the final visit Dr. Sjak-Shie again stressed the importance of compliance with medications.

During Ott's follow-ups with Dr. Sjak-Shie improvements on Ott's clotting issue were noted.  On October 17, 2006, a study, by Dr. Mohart, revealed a density most consistent with a thrombus which was unchanged from prior exams, normal ventricular size and function, and no significant valvular abnormalities.  On October 27, 2006, Ott had an echocardiogram at the direction of Dr. Sjak-Shie.  It showed that the clotting previously seen in the right atrium was no longer present, no significant valvular abnormalities, and normal left ventricular function.  On December 20, 2006, Ott had an echocardiogram which no longer showed the right atrial clotting.  Dr. Sjak-Shie discussed some other potential risks, but

discontinued Ott's Coumadin because "the right atrial thrombus is no longer detectable." She suggested Ott switch to daily aspirin to reduce her risk of strokes and heart attacks.

Ott still saw Dr. Davis while she was seeing Dr. Sjak-Shie. On November 13, 2006, Ott saw Dr. Davis for a no charge visit. He noted that Ott had bronchitis, but stated that she would quit smoking. He noted that she would use the money she had not paid for that visit toward Chantix. That same date Dr. Davis provided a letter regarding Ott's conditions. He stated: "On 10/17/06, Ms. Ott underwent an echocardiogram in which there was still a question of the presence of thrombi in these locations, can be notoriously hard to detect, and once it is detected on echocardiogram, it should be considered as present even if studies from other angles do not. In summary, I believe that Ms. Ott still has her atrial thrombus and that this information is being integrated into her treatment plan." Other records from November 2006 note treatment at Dr. Davis's office for upper respiratory infection and pneumonia.

On June 19, 2007, Ott visited Dr. Davis for a no charge visit. He refilled her medications. He further noted that Ott has no insurance and her medical problems were "as stable as they could be given her medically indigent status." He stated that Ott could not afford any recommended surveillance blood work.

On July 27, 2007, Ott saw Dr. Sjak-Shie. Dr. Sjak-Shie determined that the right atrial clotting had resolved after one year of treatment, and that Ott had done "quite well" without symptoms to suggest any recurring clotting. She recommended continuation of daily aspirin without other intervention.

On August 1, 2007, Ott saw Dr. Davis for a no charge follow up. He again noted Ott's "medically indigent" status and prescribed an aspirin a day because Ott could not afford additional interventions. Also on August 1, 2007, Dr. Davis again provided a letter regarding Ott's conditions. He noted that Ott's atrial clot had "dissolved." Dr. Davis also stated: "She is at significant increased risk for difficulties from [her atrial clot] as well as difficulties from endocarditis due to the damage from the blood clot. Her comorbidities of hypothyroidism, hypertension, type two diabetes, dyslipidemia, all contribute to increasing risk."

On August 20, 2007, Ott saw Dr. Davis for a no charge follow up. He prescribed Levaquin for diarrhea, abdominal cramping, and a likely bacterial infection.

From January 14, 2008 to January 16, 2008, Ott was admitted at St. John's Mercy Hospital because she woke up in the middle of the night with chest pains. The pain resolved about the time she arrived at the emergency room. Kim Colter, MD oversaw Ott's care. Dr. Colter noted that Ott was morbidly obese, had a history of right atrial clotting, was not in acute distress when admitted, and had

type two diabetes. Ott also had high blood pressure when admitted to the emergency room, which was resolved before she was released. Ott further reported shortness of breath and nausea, among other symptoms. Dr. Colter found that Ott had no recurrence of chest pain, no clotting, no anemia; and that the chest pain was potentially muscle spasms in her esophagus. Dr. Colter ordered a sleep study, and Ott's discharge medications included Lasix, L-thyroxine, Metformin and Enalapril.

On January 21, 2008, Ott visited Dr. Davis for counseling and coordination of care. Dr. Davis noted that Ott's blood pressure was high because she had failed to refill her prescription, which Ott promised to do. He continued Ott's medications and arranged a sleep study.

On February 5, 2008, Ott underwent a sleep study, which revealed moderately severe obstructive sleep apnea syndrome. During the surveillance she was studied using a continuous positive airway pressure machine, i.e., CPAP machine, at varying levels. She achieved a 100% sleep efficiency with the CPAP machine set at 11.

On February 18, 2008, Ott visited Dr. Davis. She complained of persistent and worsening flank pain for several weeks. Dr. Davis noted treatment with an oral antibiotic with no improvement, and noted that Ott reported blood in the

urine. Dr. Davis ordered lab tests. An imaging study revealed a "questionable minimal aysmmetry," among other findings.

On April 25, 2008, after the ALJ had issued his opinion, Dr. Davis provided an additional letter regarding Ott's conditions. Dr. Davis stated: "I am the primary care physician of Tina Ott. I have been so since 1994. On 04/07/2008, I did a comprehensive disability exam on Ms. Ott, and reviewed the Social Security Administration's findings regarding her disability. This examination confirmed my previous opinion that Ms. Ott has severe limitations due to her medical conditions. Ms. Ott's medical history of multiple medical problems, and the medications required to treat them, result in fatigue, myalgias, difficulties with mentation, and difficulties with concentration, that render her unable to perform her previous job as a peeler, or any other job requiring her to maintain an eight hour work day, five days a week, even at a sedentary level, as even sedentary work results in Ms. Ott having significant shortness of breath."

Also on April 25, 2008, Dr. Davis provided an assessment of Ott's limitations. Dr. Davis stated that before March 28, 2008 Ott could and could not perform the following tasks: Ott could stand one hour in an eight hour workday, walk two hours, sit four hours, and lift her own body weight. Ott could not bend, stoop, or carry any weight. Regarding pushing, pulling or foot controls, Dr. Davis stated that Ott's respiratory capacity limited her to minimal exertion. Dr. Davis

indicated that performing any of the above activities would cause Ott acute problems such as respiratory failure.  Dr. Davis stated that multiple clinical or laboratory tests support such limitations, but further stated that:  "the totality of her capacity is much worse than individual testing suggests.  The combination of factors noted in my letter and her records impair her significantly to the levels outlined above."

<u>Legal Standard</u>

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Gowell v. Apfel*, 2542 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id*., or because the court would have decided the case differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the claimant's education, background, work history, and age;

(3)     the medical evidence from treating and consulting physicians;

(4)     the claimant's subjective complaints relating to exertional and non-exertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments; and

(6)     the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is

uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

*Id*. at 1322.

### The ALJ's Findings

The ALJ found that Ott was not disabled within the meaning of the Social Security Act from February 27, 2006 through the date of the decision. She issued the following specific findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2010.

2. The claimant has not engaged in substantial gainful activity since February 27, 2006, the alleged onset date (20 CFR §§ 404.1520(b), 404.1571 et seq., 416.920(b), and 416.971 et seq.).

3. The claimant has the following severe impairments: status-post congestive heart failure and status-post embolism (20 CFR §§ 404.1520(c) and 416.920(c)).

4.　　The claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(b), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.　　"After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of light work."

6.　　The claimant is capable of performing past relevant work as a peeler in a core factory. This work does not require the performance of work-related activities precluded by the claimant's residual function capacity (20 CFR §§ 404.1565 and 416.965).

7.　　The claimant has not been under a disability, as defined in the Social Security Act, from February 27, 2006 through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

<u>Discussion</u>

Before reviewing the Commissioner's decision, I must determine what role, if any, was played by the evidence submitted to the Appeals Council by Dr. Davis on April 25, 2008. *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992). Under 20 C.F.R. § 404.970(b), the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. The newly submitted evidence thus becomes part of the "administrative record," even though the evidence was not originally included in the ALJ's record. *Nelson*, 966 F.2d at 366. Ott presented additional records to the Appeals Council that were prepared after the ALJ denied her claim. The

records consisted of an exam by Dr. Davis and a letter from Dr. Davis. He concluded that, before March 28, 2008, Ott's capacity was much worse than testing suggested. He found that Ott's medications caused her fatigue and difficulties with concentration that render her unable to perform any work because even sedentary work would result in significant shortness of breath. He further stated that Ott could stand one hour in an eight hour workday, walk two hours and sit four hours, and lift her own body weight. Ott could not bend, stoop, or carry any weight. He said Ott's respiratory capacity limited her to minimal exertion, and that performing any of the tasks in question would cause Ott acute problems such as respiratory failure.

If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case. *See* 20 C.F.R. § 404.970(b). Here, the Appeals Council considered the new evidence, adopted it as part of the administrative record, then denied review, finding that the new evidence did not provide a basis for changing the ALJ's decision. Because the Appeals Council denied review I do not evaluate the Appeals Council's decision to deny review, but whether the record as a whole, including the new evidence, supports the ALJ's determination. *Nelson*, 966 F.2d at 366.

As previously mentioned, when ruling on a denial of Social Security benefits, I must determine whether substantial evidence on the record as a whole supports the ALJ's decision. 42 U.S.C. § 405(g). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Juszczyk v. Astrue*, 349 F.3d 626, 631 (8th Cir. 2008). Additionally, review of a Commissioner's decision is deferential. *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005). Because I find that the decision denying benefits was supported by substantial evidence, I will affirm the decision.

*Obesity and Sleep Apnea*

Although Ott originally brought this action focusing on congestive heart failure, blood clotting in the heart, high blood pressure, kidney stones, and spots on her lungs, today she argues that the ALJ erred in failing to properly analyze her obesity and sleep apnea. Specifically, Ott claims the ALJ failed to consider her obesity or sleep apnea as severe impairments or the limitations arising from those conditions when determining her RFC.

At the second stage of this analysis, the ALJ was required to determine whether Ott had any severe impairments which significantly limited her ability to do basic work activities. Social Security Ruling 02-1p provides the framework for the ALJ's analysis of a claimant's obesity, and it states that "obesity may increase

the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing." *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009). Ott points me specifically to the language in SSR 02-1p stating that "some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day . . . In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea." As such, "adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R. Part 404 Subpart P Appx 1. The ALJ in this case did so, and he ultimately found no limitations related to Ott's obesity or sleep apnea. I agree.

Here, the ALJ noted Dr. Davis's determination that Ott was "morbidly obese" and that a sleep study confirmed that Ott had sleep apnea. The ALJ did not find any limitations based solely on Ott's obesity. His analysis was appropriate under the circumstances because Ott did not allege obesity as her grounds for disability, did not testify as to any limitations she credited to her obesity, and nothing in the medical records indicates that a physician ever placed physical limitations on Ott's ability perform work related tasks because of her obesity. Dr. Davis did state that Ott's diabetes was attributable to her weight, but Ott testified that her diabetes was under control and did not affect her ability to work. "[W]hen an ALJ references the claimant's obesity during the claim evaluation process, such

review may be sufficient to avoid reversal." *Heino v. Atrue*, 578 F.3d 873, 881 (8th Cir. 2009) (internal citation omitted).

The ALJ also adequately addressed Ott's sleep apnea in his narrative discussion. He noted Ott's testimony that she used a CPAP machine and the finding, during her sleep study, that the sleep apnea was "corrected with CPAP of 11." "Not all individuals with sleep apnea develop a functional impairment that affects work activity." 20 C.F.R. Part 404 Subpart P Appx 1. The ALJ did not specifically find that the sleep apnea was more severe because of Ott's obesity, which was appropriate here because none of the medical evidence demonstrates that the sleep apnea was caused or worsened by Ott's weight. Ott did testify that she was tired all the time because of her poor sleep, but the ALJ found that Ott's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible and the medical evidence indicates that the CPAP corrected her sleep apnea.

Ott also argues that the bending and stooping limitations Dr. Davis's new evidence revealed are "on their face consistent with morbid obesity." Again, the ALJ was not presented with this evidence, but because the Appeals Council adopted it as part of the administrative record I must consider whether the record as a whole, including the new evidence, still supports the ALJ's decision. Dr. Davis said that it was Ott's respiratory capacity that limited her to minimal

exertion and over exertion would cause Ott acute problems such as respiratory failure. Dr. Davis did not attribute those limitations on Ott to her weight. The substantial evidence on the whole record supports the ALJ's treatment of Ott's obesity and sleep apnea. *See McNamara v. Astrue*, 590 F.3d 607, 611 (8th Cir. 2009) (holding that because neither the claimant's testimony nor the medical records demonstrate that obesity resulted in work related limitations, "it was not reversable error for the ALJ's opinion to omit specific discussion of obesity.")

*Treating Physician*

Ott argues that the ALJ erred in weighing the medical evidence because he did not follow the directives and factors in 20 C.F.R. § 404.1527(d). She believes Dr. Davis's opinions on her limitations, contained in the evidence submitted after the ALJ's decision, should have been given more weight because he actually examined her, he was a treating physician, and the extent of her relationship with Dr. Davis was greater than her relationship with any other doctor involved in this case. While the ALJ could not have considered this new evidence in his analysis, I will consider whether the ALJ's opinion is still supported by the substantial evidence in light of Dr. Davis's assessment. The substantial evidence in the record as a whole does not support Dr. Davis's opinion regarding the extent of Ott's limitations.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)); *see also Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009)*. A treating physician's opinion, however, is not given controlling weight where it is inconsistent with the physician's own records. *See* 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion); *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."); *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate need to evaluate the record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir.2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment).

The limitations on lifting, bending, stooping, carrying, and concentration appear at no other place in the record other than Ott's own testimony, which was discredited by the ALJ. Ott did not even allege the extent of limitations Dr. Davis diagnosed in her own testimony. Dr. Davis said that Ott could not bend, stoop, or carry any weight at all, but Ott testified that she could stoop and bend at her knees, but not a lot. Ott testified that she could carry 20 pounds, but not very far. Ott also testified that her problems had not gotten worse over time, but they had stayed the same. Dr. Davis's diagnosis regarding concentration limitations had also never been noted and was contradicted by the claimant's own testimony. Ott testified that she built puzzles, did all of the driving for her family, occasionally read books, and had no problems reading. Dr. Davis had likewise never specifically addressed Ott's fatigue, other than prescribing her medication to help with her insomnia.

Additionally, Ott alleges a disability onset date of February 27, 2006, but it was Dr. Davis who returned Ott to full duty on or about January 30, 2006 to a convenience store clerk position that required Ott to lift 30 to 40 pounds, stand and walk for a full eight hour shift, bend, and stoop. Although Ott testified that "her doctor" told her she could no longer work there because of her congestive heart failure two weeks later, the medical evidence does not corroborate that testimony. In fact, the notes of Dr. Sjak-Shie state that on June 27, 2006, Ott told

Dr. Sjak-Shie she had lost her employment.  Further, no other physician placed such strict limitations on Ott.

With respect to the shortness of breath, Dr. Davis said that Ott could not perform any work because even sedentary work results in Ms. Ott having significant shortness of breath.  Ott's earlier medical records do note shortness of breath, and Ott testified that she experienced shortness of breath, but the ALJ found that her allegations regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  Ott's claims and Dr. Davis's post hearing diagnosis are contradicted by some of the later medical records that were available at the hearing.  Specifically, on January 13, 2006 and March 9, 2006, Dr. Davis noted that Ott had no shortness of breath.  These dates are before and after Ott's alleged onset date.  Further, on four separate occasions, between May 2006 to December 2006, Dr. Sjak-Shie noted that Ott was not suffering any acute dyspnea, i.e., shortness of breath, or wheezing.  Again, Ott testified that her problems had not gotten worse over time, but they had stayed the same.  The Appeals Council found that Dr. Davis's new evidence did not provide a basis for changing the ALJ's decision, and I agree.  The substantial evidence on the record before me supports the ALJ's decision.

Ott also argues that the ALJ gave inappropriate weight to a non-examining state agency consultant who the parties agree is not a physician.  The ALJ did

inappropriately cite to SSR 96-6p stating that the state agency consulted was an "expert opinion."  In *Dewey v. Astrue*, 509 F.3d 447, 448 (8th Cir. 2007), the United States Court of Appeals for the Eighth Circuit remanded an ALJ's decision where the ALJ mistakenly credited an RFC assessment as being authored by a physician when it had actually been authored by a counselor, who was neither a physician or medical consultant.  The ALJ ignored medical evidence by the claimant's treating physician in order to rely solely upon the findings of a Residual Functional Capacity Assessment conducted by a lay person, who the ALJ erroneously believed was a physician.  *Id.* at 449–50.  The Eighth Circuit reversed stating the ALJ erred in basing his decision to deny benefits upon the Residual Functional Capacity Evaluation while weighing that evidence as though it had been completed by a physician, not as having been completed by a lay person.  *Id.* The court explained that the error was not harmless because absent this mistake the ALJ would have been less likely to disregard the more restrictive opinion of the claimant's treating physician, and so the ALJ might have reached a different ultimate conclusion.  *Id.*

Unlike the claimant in *Dewey*, Ott has not argued that the ALJ's outcome would have been different had he known that the assessment was not completed by a physician.  Only after the ALJ reviewed the medical evidence did he look to the assessment.  In *Dewey*, the ALJ ignored the treating physician in order to embrace

the findings of the lay person with no medical qualifications. In so doing, when that testimony was stricken the ALJ's decision was no longer supported by substantial evidence, and in fact stood opposite to the only medical evidence presented. Much differently, here, the ALJ's decision is based upon a much broader medical record as well as upon his own assessment of Ott's credibility. Before considering the opinions of the state agency consultant, the ALJ considered the diagnosis and treatment of Dr. Davis, Dr. Mohart, and Dr. Sjak-Shie available to him at the time. No evidence, before Dr. Davis's new evidence, contradicts the assessment, and Dr. Davis's new evidence conflicts with the record as a whole. Consequently, the ALJ supported his opinion with sufficient objective medical evidence and medical opinions for me to conclude that, even if the ALJ understood that the RFC assessments was completed by a non-physician, he would have reached the same result, and any error in attributing the assessment to that of a physician does not warrant remand.

*Vocational Testimony*

Ott argues that the ALJ erred in improperly analyzing the requirements of her prior work and failing to obtain vocational testimony regarding those requirements. Specifically, the ALJ stated that Ott could perform her past relevant work as a peeler. He noted that Ott had reported, on her work history report, that she walked for one hour, stood for four hours, sat for four hours, lifted 20 pounds

at most, and lifted 10 pounds frequently as a peeler.  But, at the hearing, Ott

testified that she lifted from 50 to 60 pounds as a peeler.  Ott contradicted her own

application, and the ALJ was not in error for relying on the statements Ott made in

three years after she stopped working as a peeler as opposed to five years after.

Further, Ott had to meet her initial burden of proof by showing the existence of a

disability before the testimony of a vocational expert is required.  *Johnston v.*

*Shalala*, 42 F.3d 448, 452 (8th Cir. 1994) (citing *Groeper v. Sullivan*, 932 F.2d

1234, 1235 n. 1 (8th Cir. 1991)).  The testimony of a vocational expert is only

required when the burden shifts to the Commissioner, at step five, and the

claimant has a nonexertional impairment.  *Johnston*, 42 F.3d at 452 (internal

citations omitted).  Because in this case, the ALJ did not proceed past step four,

the use of vocational expert testimony was unnecessary.

*Expression of RFC*

Ott argues that the ALJ erred in expressing her RFC determination solely in

terms of the exertional category of "light" work because Social Security Ruling

96-8p states that the RFC must not be expressed initially in terms of the exertional

categories of "sedentary," "light," "medium," "heavy," and "very heavy" work

because the first consideration at this step is whether the individual can do past

relevant work as he or she actually performed it.  In his opinion, the ALJ stated

that after careful consideration of the entire record, he found Ott had the RFC to

perform a full range of light work. While the ALJ did express Ott's RFC in terms of the "light" exertional category, the ALJ also provided a narrative discussion of Ott's past relevant work as compared to the medical evidence and Ott's own testimony with respect to her daily activities. The ALJ's RFC determination is supported by a narrative discussion. *Knox v. Astrue*, 327 Fed. Appx 652, 657 (7th Cir. 2009) ("Although the RFC assessment is a function-by-function assessment, ... the expression of a claimant's RFC need not be articulated function-by-function."). While the ALJ's decision writing may have been deficient, Ott has not shown how this affected his decision. *See, e.g., Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011) (holding that reversal is not required by an ALJ's deficient opinion writing unless that deficiency affected the outcome). Thus, the ALJ's use of "light work" in Ott's RFC does not require remand.

For these reasons, the ALJ's decision in this case is affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is affirmed. A separate judgment in accord with this Memorandum and Order will be entered this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 9th day of Cr tkn, 2012.